# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

**STEPHEN P.,[1]**

        **Plaintiff,**

    **v.**

**MARTIN O'MALLEY,**
**Commissioner of Social Security,**

        **Defendant.**

        **Case No. 1:22-cv-5638**
        **Magistrate Judge Norah McCann King**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Stephen P. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying those applications.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Martin O'Malley, the current Commissioner of Social Security, is substituted as Defendant in his official capacity. *See* Fed. R. Civ. P. 25(d).

## I.     PROCEDURAL HISTORY

On September 11, 2014, Plaintiff protectively filed applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI"), alleging that he has been disabled

since December 1, 2013. R. 64, 78, 92, 108, 219–31. The applications were denied initially and

upon reconsideration. R. 124 –35, 142–45. Plaintiff sought a *de novo* hearing before an

administrative law judge ("ALJ"). R. 146–51. An ALJ held an administrative hearing on

December 18, 2017, at which Plaintiff, who was represented by counsel, appeared and testified,

as did a vocational expert. R. 37–63. In a decision dated September 10, 2018, that ALJ

concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any

time from December 1, 2013, Plaintiff's alleged disability onset date, through the date of that

decision. R. 20–31. On appeal, however, this Court reversed that decision and remanded the

matter for further proceedings. R. 1042–46; [*P.*] *v, Comm'r of Soc. Sec.*, 2:19-cv-16289 (D.N.J.

Aug. 20, 2020).

On remand, ALJ Karen Shelton held an administrative hearing on March 18, 2021,

addressing Plaintiff's original applications as well as Plaintiff's second application for DIB,

which was filed on October 16, 2019, and which was consolidated with his earlier applications.

R. 1051. Plaintiff was again represented by counsel and testified, as did a vocational expert. R.

955–93. In a decision dated April 30, 2021, ALJ Sheldon concluded that Plaintiff was not

disabled for purposes of DIB from December 1, 2013, Plaintiff's alleged disability onset date,

through June 30, 2018, the date on which he was last insured for DIB. R. 944–45 ("the 2021

decision"). ALJ Sheldon also concluded that, although Plaintiff was not disabled prior to

September 10, 2020, he became disabled and eligible for SSI on that date and continued to be

disabled through the date of that decision. *Id*. The Appeals Council declined to assume

jurisdiction on August 12, 2022, R. 901–07, and Plaintiff timely filed this appeal pursuant to 42

U.S.C. § 405(g). ECF No. 1. On April 18, 2023, Plaintiff consented to disposition of the matter

by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal

Rules of Civil Procedure. ECF No. 13.[3] On April 24, 2023, the case was reassigned to the

undersigned. ECF No. 14. The matter is ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations. And whatever the meaning of substantial in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial evidence, this
> Court has said, is more than a mere scintilla. It means – and means only – such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations and quotation marks omitted);

*see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations

omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and

quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091,

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see*

*K.K.*, 2018 WL 1509091, at *4.  The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

**B.    Sequential Evaluation Process**

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at §§ 404.1509, 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    THE 2021 DECISION AND APPELLATE ISSUES

Plaintiff met the insured status requirements of the Social Security Act through June 30, 2018. R. 921. At step one, ALJ Sheldon found that Plaintiff had not engaged in substantial gainful activity between December 1, 2013, his alleged disability onset date, and the date of the 2021 Decision. R. 922.

At step two, the ALJ found that, since December 1, 2013, Plaintiff suffered the following severe impairments: spine disorder (degenerative disc disease), status-post amputation of two

toes of the left foot, left shoulder osteoarthritis and superior labrum anterior to posterior tear, post-traumatic stress disorder, and rule out schizophrenia versus paranoid delusional disorder. R. 922. The ALJ also found that Plaintiff's obstructive sleep apnea, hypertriglyceridemia, atherosclerosis of extremities, and right carpal tunnel syndrome status-post right carpal tunnel decompression were not severe impairments. R. 922–24.

At step three, the ALJ found that, since December 1, 2013, Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 924–29.

At step four, the ALJ found that, since Plaintiff's alleged disability onset date of December 1, 2013, Plaintiff had the RFC to perform light work subject to various additional limitations. R. 929–42. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a generator operator mechanic. R. 942.

At step five and relying on the testimony of the vocational expert, the ALJ found that, prior to September 10, 2020, a significant number of jobs—*e.g.,* approximately 170,000 jobs as a small product assembler, approximately 160,000 jobs as a packer and sorter, and approximately 190,000 jobs as a labeler—existed in the national economy and could be performed by Plaintiff. R. 943–44. Accordingly, the ALJ concluded that Plaintiff was not disabled for DIB prior to the lapse of his insured status on June 30, 2018. However, the ALJ further concluded that, as of September 10, 2020, *i.e.*, the date on which Plaintiff's age category changed, Plaintiff was deemed disabled for SSI under Medical-Vocational Rule 202.06. R. 944-45.

Plaintiff disagrees with the ALJ's findings at steps four and five and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 10; *Plaintiff's*

*Reply Brief*, ECF No. 14. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 12.

## IV. SUMMARY OF RELEVANT MEDICAL EVIDENCE

On January 5, 2018, Cordula Holzer, M.D., Plaintiff's treating psychiatrist, completed a three-page, check-the-box and fill-in-the blank form entitled, "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." R. 890–92 (Exhibit 8F).[4] Dr. Holzer opined that Plaintiff had moderate limitations (meaning more than a slight limitation but still able to function satisfactorily) in his ability to understand and remember and carry out simple instructions and marked limitations (meaning a serious limitation; a substantial loss in the ability to effectively function) in his abilities to make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. R. 890. Plaintiff also had marked limitations in his abilities to interact appropriately with supervisors, co-workers and the public, and to respond appropriately to usual work situations and to changes in a routine work setting. R. 891. Asked to explain the factors that supported her assessment, Dr. Holzer responded that Plaintiff "had a psychotic episode in 2001 and needed inpatient care[.]" *Id*. Dr. Holzer also explained that Plaintiff "was not able to work with others due to paranoid ideas" and that Plaintiff "has visual and auditory hallucinations[.]" *Id*. According to Dr. Holzer, Plaintiff's limitations first appeared

---

[4] A duplicate of this source statement also appears at R. 1829–31 (Exhibit 17F/5–7). For ease of reference, the Court will refer only to the statement appearing earlier in the record.

in 2001. *Id*.

## V.     DISCUSSION

### A.     RFC and Opinion Evidence

ALJ Sheldon determined that, since his alleged disability onset date of December 1,

2013, Plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that since December 1, 2013, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: Lift/carry 20 pounds occasionally and 10 pounds frequently. Stand/walk for three of eight hours. Sit for six of eight hours. Only frequently push/pull with the left upper extremity. Only occasional overhead reaching on the left. Frequently reach in all other directions on the left non-dominant side. Occasionally climb ramps and stairs. No climbing ladders, ropes, or scaffolds. Frequently balance, stoop, and kneel. Occasionally crouch. No crawling. Can follow simple instructions and simple work decisions, and have occasional interaction with supervisors and coworkers and no interaction with the public.

R. 929. Plaintiff argues that substantial evidence does not support this determination because the

ALJ failed to properly evaluate Plaintiff's physical and mental impairments and erred in

assessing Dr. Holzer's opinion. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 13–23.

Plaintiff's arguments are not well taken.

A claimant's RFC is the most that the claimant can do despite his limitations. 20 C.F.R.

§§ 404.1545(a)(1), 416.945(a)(1). At the administrative hearing stage, it is the ALJ who is

charged with determining the claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c); *see also*

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or

examining physicians or State agency consultants—must make the ultimate disability and RFC

determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to

consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ

need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554

(3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

In finding that Plaintiff had the RFC for a limited range of light work, ALJ Sheldon detailed years of record evidence regarding Plaintiff's physical impairments,[5] including, *inter alia*, evidence of an August 2014 lawn mower accident that resulted in surgery and amputation of the first and second digits on Plaintiff's left foot; medical treatment consisting of oral medication (including Oxycodone), shoe orthotics with a left forefoot rocker, physical therapy, prescribed medical marijuana as of March 2021, and outpatient office visits that noted spinal surgery, left shoulder surgery, and additional left lower extremity surgery; evidence that Plaintiff had presented to the emergency room, without hospital admission, on only two occasions since his alleged disability onset date: in March 2014 for left shoulder pain (during which Plaintiff refused medication) and in September 2020 for back pain and a shoulder contusion secondary to a motor vehicle accident; findings of left shoulder tearing with "severe" osteoarthritis or "severe" impingement in the left shoulder, but otherwise generally normal or only minimal findings; MRIs of the left shoulder in March 2010, December 2013, April 2015, and November 2018 that revealed labral/SLAP tearing; the MRI finding in December 2013 of "severe" degenerative changes of the glenohumeral joint and "severe" impingement related to acromioclavicular

---

[5] The Court focuses its discussion on Plaintiff's left foot and left shoulder, which, as discussed below, are the focus of Plaintiff's challenge to the physical RFC. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 18–19.

("AC") arthritis, and the December 2018 MRI finding of "moderate to severe" glenohumeral joint osteoarthritis; left shoulder x-rays in January 2015, July 2015, and November 2019 that revealed "moderate-to-severe" degenerative changes and left shoulder MRIs in October 2011 and December 2014 that failed to reveal any other tearing or impingement; the March 2013 MRI that revealed left shoulder impingement, but subsequent MRIs that failed to reveal that condition; MRIs taken in December 2014, April 2015 and November 2018 that revealed only "moderate" AC and/or glenohumeral joint osteoarthritis, and the fact that none of the MRIs and x-rays revealed any noted fracture or dislocation; physical examination records from the Veterans Administration ("VA") that also revealed, as to the left upper extremity, inconsistent exam findings of subjective tenderness in the left shoulder or left biceps area, subjectively painful or decreased ranges of left shoulder motion, positive formal left shoulder testing, and a subjective "feeling of instability" in the left shoulder "which resolved with posteriorly directed force on the humerus"; records dated August to October 2014 that reflect findings of a post-amputation of two toes on the left foot with "mild" subjective tenderness, edema, or "mild" erythema at the amputation site area; the September 2014 notation that Plaintiff was non-weight bearing and the provider "advising" Plaintiff, at an exam in October 2014, "to no longer use his crutches"; a provider's records dated from March 2014, November 2015, and March, May and July 2019, that document a single finding of "mild" left shoulder tenderness and a single finding of positive Tinel testing over the median nerve at the level of the right wrist and positive Phalen testing for paresthesia into the fingertips with diminished sensation to pinprick at the right median nerve distribution; findings of "near full" (as opposed to simply "full") ranges of motion in the right wrist, finger and thumb in May 2019 and only "mild" soft tissue swelling and "minimal" hypersensitivity in the right wrist surgical area in July 2019. R. 930–33.

The ALJ explained her consideration of Plaintiff's physical impairments when crafting

the RFC for a limited range of light work:

> Simply stated, other than the above-stated two-left toe amputation and findings of two amputated toes on the left foot and left shoulder tearing with "severe" osteoarthritis or "severe" impingement in the left shoulder, the record documents an otherwise conservative, albeit multiformed, course of treatment and generally normal with only minimal findings. Further, the extent of the claimant's limitations is not entirely consistent with the same.
>
> Therefore, this evidence, including objective findings, course of treatment, and the claimant's actions and admissions fully supports the lifting, carrying, postural, and left upper extremity pushing, pulling, overhead reaching, and reaching in all other directions limitations in the assessed residual functional capacity. Further, this evidence, and the evidence set forth in the Finding Three and Four discussions, does not support the assessment of different or additional limitations. Additionally, the undersigned accounted for the claimant's subjective allegations (including, but not limited to, pain) and potential medication side effects (such as sleepiness) when making this assessment.
>
> In fact, the undersigned not only accounted for the above-stated two left toe amputation and abnormal lower extremity findings when limiting standing/walking to three of eight hours and assessing the above-stated climbing limitations, but also for the claimant's subjective allegations of back and left foot pain as well as assistive device use.
>
> Further, the undersigned not only accounted for the above-stated abnormal left shoulder/left upper extremity findings when limiting lifting/carrying to the light exertional level and assessing the above-stated ladder/rope/climbing, crawling, and left upper extremity pushing, pulling, overhead reaching, and reaching in all other directions limitations. The undersigned also accounted also for the claimant's subjective allegations of pain and his hearing testimony that he could lift 15-20 pounds with his right arm alone, when assessing said limitations.
>
> Moreover, the undersigned not only accounted for the above-stated abnormal findings when assessing the above-stated lifting, carrying, standing, walking, sitting, and postural limitations, but also for the claimant's subjective allegations of pain and potential sleepiness secondary to medication, pain or mental health symptoms.

R. 933.

The ALJ also considered years of record evidence addressing Plaintiff's mental

impairments, including, *inter alia*, a conservative course of mental health treatment, Plaintiff's

inconsistent attendance at counseling and medication management sessions, Plaintiff's

inconsistent compliance with or decline of medication treatment, the broad range of mostly

normal findings, and evidence of Plaintiff's inconsistent effort on exam tasks. R. 934–37. The

ALJ went on to explain her consideration of the limitations flowing from Plaintiff's mental

impairments as follows:

> Therefore, this evidence, including objective findings, course of treatment, and the claimant's actions and admissions fully supports the mental limitations in the assessed residual functional capacity. Further, this evidence, and the evidence set forth in the Finding Three and Four discussions, does not support the assessment of different or additional limitations. Additionally, the undersigned accounted for the claimant's subjective allegations (including, but not limited to, pain) and potential medication side effects (such as sleepiness) when making this assessment.

R. 937. In the view of this Court, this record contains substantial evidence to support the ALJ's

RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*, 186

F.3d at 429.

Plaintiff challenges the ALJ's physical RFC determination, arguing first that the ALJ

failed to accommodate his severe left foot impairment (status-post amputation of two toes).

*Plaintiff's Memorandum of Law*, ECF No. 10, pp. 18–19. Plaintiff specifically complains that the

RFC requires him to walk/stand for a combined total of 3 hours per workday and there is no

limitation regarding foot controls or driving. *Id*. Plaintiff further complains that the ALJ

"indicates that she also considered the use of an assistive device but confusingly that is not

included in the RFC." *Id*. at 18 (citing R. 933). Plaintiff's arguments are not well taken.

As detailed above, the ALJ specifically noted, *inter alia*, that Plaintiff's foot surgery was

without complication, R. 930; that post-surgical examinations showed only mild findings such as

swelling and tenderness, R. 932; that Plaintiff was noted to be non-weight bearing only in

September 2014, *id*.; that by October 2014, Plaintiff's podiatrist recommended that Plaintiff "no

longer use his crutches[,]" *id*.; and that examinations generally reflected normal strength, intact sensation, and normal gait with no noted pain behaviors, including on standing/walking after sitting, *id*. This evidence provides substantial support to the ALJ's finding that Plaintiff could stand/walk for three hours in an eight-hour workday. R. 929.

To the extent that Plaintiff suggests that the ALJ should have included limitations in connection with foot controls and driving, Plaintiff points to no medical opinion or functionality finding supporting such limitations. *See Plaintiff's Memorandum of Law*, ECF No. 10, pp. 18–19. Instead, Plaintiff states that the vocational expert testified that the three jobs identified by her (and ultimately relied upon by the ALJ at step five) require, *inter alia*, foot controls. *Id*. (citing R. 988). However, as the Commissioner correctly points out, the vocational expert did not, in fact, testify that the jobs required this skill. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No 12, pp. 14–15 (citations omitted). Asked by the ALJ to assume a claimant with Plaintiff's vocational profile and the RFC ultimately found by the ALJ, including the three hour walk/stand limitation, the vocational expert testified:

> . . . [S]o having sitting and standing only three hours has an impact on the overall range of light, unskilled work. But these particular jobs are jobs that are typically performed seated at a bench assembling items, packing items and labeling items. So, it is the 20-pound lift that is the issue more, that classifies them as light more than the stand and walk. So, *it* [the three-hour walk/stand limitation] *would allow for the jobs identified* but does have an impact on the *overall* light, unskilled labor market.

R. 988 (emphasis added); *see also* R. 988–89 (reflecting the vocational expert's clarification that the "impact" means that the three identified jobs could be performed and that the limitation "would not reduce these numbers. It would reduce the *overall* access to the light, unskilled labor market" but that these three identified jobs could still be performed) (emphasis added).

15

Plaintiff's conclusory assertion that the ALJ "confusingly" did not include in the RFC the requirement that Plaintiff be able to use an assistive device is similarly unavailing. *Plaintiff's Memorandum of Law*, ECF No. 10, p. 18. "[An] ALJ need not account for use of a hand-held assistive device in an RFC assessment unless that device is medically required." *Mundo v. Kijakazi*, No. 1:21-CV-517, 2023 WL 2632810, at *5 (M.D. Pa. Mar. 24, 2023). "However, if the claimant makes this threshold showing of medical necessity, then it is incumbent upon the ALJ to directly 'address the evidence concerning Plaintiff's use of' the assistive device." *Figueroa v. Kijakazi*, No. 1:22-CV-194, 2023 WL 2432909, at *10 (M.D. Pa. Mar. 9, 2023) (quoting *Steward v. Comm'r of Soc. Sec.*, No. CIV.A 08-1741, 2009 WL 1783533, at *5 (W.D. Pa. June 23, 2009)). "[T]he failure to do so may require a remand." *Id*. (citations omitted).

SSR 96-9p addresses this issue:

> **Medically required hand-held assistive device**: To find that a hand-held assistive device is medically required, *there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).* The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9P, 1996 WL 374185, at *7 (S.S.A. July 2, 1996) (emphasis added). "A claimant's testimony that a cane has been prescribed is not enough to meet this burden." *Mundo*, 2023 WL 2632810, at *5 (citations omitted). Similarly, a prescription for an assistive device with "no discussion of its medical necessity" is "insufficient to support a finding that [an assistive device] was medically necessary." *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. Nov. 25, 2002) ("Other than that [a prescription and a checked box that an assistive device was required for ambulation], there are multiple references to the fact that appellant uses a cane but no discussion

16

of its medical necessity. The evidence presented by appellant was insufficient to support a finding that his cane was medically necessary.").

In the present case, Plaintiff has not established that a cane was medically necessary. The record reflects, *inter alia*, that Plaintiff was non-weight bearing only in September 2014; by October 2014, Plaintiff's podiatrist had recommended that Plaintiff not use his crutches, and examinations thereafter generally reflected normal strength, intact sensation, and normal gait. R. 932. The ALJ specifically observed that Plaintiff did not report that he used a cane, crutches, or a walker at the administrative hearing or in his 2019 and 2020 Function Reports. R. 937. The ALJ also noted that treating records "failed to reveal, despite [a] short period of a non-weight bearing status following the above-stated two-left toe amputation with presumed crutches use, any noted assistive device use upon exam." R. 932–33. The ALJ's consideration and discussion of this evidence reflects that she implicitly found that a cane was not medically necessary. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (noting that the ALJ "need not employ particular 'magic' words" in discussing the reasons for the decision) (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 & n.3 (3d Cir. 2004)); *Johnson v. Kuakazi* [sic], No. CV 22-914-SRF, 2023 WL 6387906, at *8 (D. Del. Sept. 29, 2023) (finding that, where the ALJ discussed the objective findings regarding the claimant's normal gait without the use of a walker and Plaintiff's own statements regarding the same, which led the ALJ to conclude that the "'medical evidence of record supports that . . . the claimant sometimes uses a walker, she is able to ambulate without it[,]'" "[i]t can reasonably be inferred from this conclusion that the ALJ found Plaintiff's use of an assistive device was not medically necessary, and this conclusion is supported by substantial evidence"). Where, as here, the record contains no evidence of a prescription containing a description of the cane's medical necessity and where other record and opinion evidence

17

indicates that Plaintiff could ambulate without the use of an assistive device, Plaintiff has not shown that such device was medically necessary.

In continuing to challenge the physical RFC, Plaintiff complains that, although the ALJ found a severe left shoulder impairment and non-severe right carpal tunnel syndrome status-post decompression, the ALJ erred in failing to include corresponding restrictions in the RFC, such as in the areas of handling, fingering, and feeling. *Plaintiff's Memorandum of Law*, ECF No. 10, p. 19. Plaintiff argues that the ALJ's failure to explain how Plaintiff "could sustain work in—'rapid' per the VE [vocational expert]—production line occupations, despite medically determinable left shoulder and right wrist impairments is harmful error." *Id.* (citing R. 988). Plaintiff's arguments are not well taken.

As detailed above, when crafting the RFC, the ALJ expressly considered both the severe left shoulder impairment and the non-severe right carpal tunnel syndrome status-post decompression—along with Plaintiff's other impairments—at step four. R. 929–42. The ALJ also specifically explained that this record — along with Plaintiff's actions and admissions — "fully supports the lifting, carrying, postural, and left upper extremity pushing, pulling, overhead reaching, and reaching in all other directions limitations in the assessed residual functional capacity" and that the evidence detailed in steps three and four,[6] "does not support the

---

[6] The evidence at step three included, *inter alia*, a discussion of why Plaintiff's right carpal tunnel syndrome status-post carpal tunnel depression was non-severe:

> As to right carpal tunnel syndrome status-post right carpal tunnel decompression, the undersigned notes, an electromyography study (EMG) in March 2019 revealed "moderately severe" neuropathy at the right wrist consistent with carpal tunnel syndrome (Exhibit 15F/-10). However, the record revealed that the claimant underwent right carpal tunnel decompression on May 13, 2019 without reported complication (Exhibit 15F/3-4). Further, the extent of abnormal right wrist/hand/finger upon exam were minimal, and only found at exams in March, May and July 2019. Specifically, the record documents, prior to the above-stated

assessment of different or additional limitations." R. 933. The ALJ further explained that she

"not only accounted for the above-stated abnormal left shoulder/left upper extremity findings

when limiting lifting/carrying to the light exertional level and assessing the above-stated

ladder/rope/climbing, crawling, and left upper extremity pushing, pulling, overhead reaching,

and reaching in all other directions limitations [*i.e.*, only frequently push/pull with the left upper

extremity; only occasional overhead reaching on the left and frequently reach in all other

directions on the left non-dominant side; only occasionally climb ramps and stairs and no

climbing ladders, ropes, or scaffolds; and no crawling]" and she also accounted for Plaintiff's

"subjective allegations of pain and his hearing testimony that he could lift 15-20 pounds with his

right arm alone, when assessing said limitations." *Id*. Moreover, "[a] diagnosis alone . . . does

not demonstrate disability." *Foley v. Comm'r of Soc. Sec*., 349 F. App'x 805, 808 (3d Cir. 2009)

(citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)); *see also Phillips v. Barnhart*, 91

F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the

diagnosis of an impairment rather than the functional limitations that result from that

impairment. A diagnosis of impairment, by itself, does not establish entitlement to benefits under

---

right carpal tunnel decompression, one-time exam findings of positive Tinel testing over the median nerve at the level of the right wrist in March 2019 (Exhibit 15F/12) and positive Phalen testing for paresthesia into the fingertips ("mostly at the index and long finger and thumb") with diminished sensation to pinprick at the right median nerve distribution in May 2019 (Exhibit 15F/5-6). The record also documents, in the context of post-surgical recovery, "near" full as opposed to simply "full" ranges of right wrist, finger and thumb motion in May 2019 (Exhibit 5F/1, 2) and only "mild" soft tissue swelling and "minimal" hypersensitivity in the surgical area with full ranges of right wrist, finger and thumb motion in July 2019 (Exhibit B2F/26). Moreover, the record otherwise fails to document abnormal right wrist/hand/finger exam findings (Exhibits 1F-20F; B1F-B11F; B1F-B11F). The record also fails to document aggressive or consistent treatment for this condition since the decompression surgery (Exhibits 1F-20F; B1F-B11F; B1FB11F).

R. 923.

19

the Act"). Notably, Plaintiff does not identify any specific functional limitations, such as

handling, fingering, or feeling, found by any medical source that the ALJ failed to include in the

RFC. *See Plaintiff's Memorandum of Law*, ECF No. 10, p. 19. Although Plaintiff again points to

the vocational expert's testimony to argue that the ALJ erred in failing to explain how Plaintiff

could sustain work in high pace production line occupations in light of his left shoulder and right

wrist impairments, *id*., it is again significant to note that the vocational expert did not identify

jobs that required such work. R. 988. Under these circumstances, the ALJ did not err in failing to

include in the RFC limitations such as handling, fingering, or feeling. *See Rutherford*, 399 F.3d

at 554; *Grella*, 2014 WL 4437640, at *18.

Plaintiff also argues that the ALJ failed to properly evaluate Plaintiff's mental

impairments. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 19–21; *Plaintiff's Reply Brief*,

ECF No. 14, pp. 5–6. Plaintiff specifically argues that, at step three of the sequential evaluation,

the ALJ found a moderate limitation in the area of concentration, persistence, or pace, but that

the RFC "does not reflect [that limitation] in any discernable way." *Plaintiff's Memorandum of

Law*, ECF No. 10, p. 20 (citing R. 928). Plaintiff also complains that the RFC contains no

reference to time off task, absences, changes in the work setting, or production pace "despite

evidence in the record supporting, and the ALJ finding, such a restriction." *Id*. at 21. Plaintiff

further argues that the ALJ's failure in this regard is "crucial" because the vocational expert

testified that the three jobs identified by her were classified as light because the pace of the work

is rapid. *Id*. Plaintiff also complains that the ALJ failed to explain why a restriction to simple

instructions and work decisions adequately accommodates a moderate limitation in

concentration, persistence, or pace. *Id*. (citing R. 988). Plaintiff's arguments are not well taken.

20

As a preliminary matter, although Plaintiff asserts in conclusory fashion that the record contains evidence regarding needed time off task, absences, changes in the work setting, and pace, Plaintiff cites to no such evidence. *See Plaintiff's Memorandum of Law*, ECF No. 10, p. 21.

Moreover, to the extent that Plaintiff complains that the ALJ did not sufficiently explain how the RFC limitations of, *inter alia*, following simple instructions and making simple work decisions accommodated his moderate limitation in the area of concentration, persistence, or pace, this Court disagrees. *See Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 211 (3d Cir. 2019) (finding that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace'") (citing *Ramirez v. Barnhart*, 372 F.3d 546 (3rd Cir. 2004)); *see also id* at 210 ("A limitation to 'simple tasks' is fundamentally the same as a limitation 'to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions[.]'") (citations omitted).  As the recitation of the evidence above reflects, the ALJ's decision offers a "valid explanation" for the RFC determination. In fashioning the RFC, the ALJ expressly relied on, *inter alia*, examination findings that revealed, among other things, that Plaintiff had intact attention, was able to recall 3/3 items immediately, repeat five digits forward, and perform serial threes, and simple addition and subtraction problems, that Plaintiff arrived at the exam "unaccompanied by bus," and that he had no problem completing a basic information form. R. 935. The ALJ also considered Plaintiff's own reports that he handled stress "as necessary" and that he performed a wide variety of activities, including personal care activities, preparing simple meals, cleaning his room/space, reading (albeit every few months), watching television ("usually" world news and current events), using public transportation, shopping in stores and via phone, going to the library or visiting a neighbor or friend, and

attending appointments at the VA. R. 937. The ALJ's consideration of this evidence sufficiently

explains why she concluded that a limitation to following simple instructions and making simple

work decisions amply accommodates Plaintiff's moderate limitation in concentration,

persistence, or pace. *See Hess*, 931 F.3d at 214 (finding that ALJ's explanation was sufficient

where the ALJ "highlighted, among other things, the following: mental status examinations and

reports that revealed that Hess could function effectively; opinion evidence showing that Hess

could do simple work; and Hess's activities of daily living, which demonstrated that he is

capable of engaging in a diverse array of 'simple tasks'"); *cf. Menkes v. Astrue*, 262 F. App'x

410, 412–13 (3d Cir. 2008) ("The term 'simple routine tasks,' in the context of the disability

proceedings, generally refers to the non-exertional or mental aspects of work. For example,

performing a 'simple routine task' typically involves low stress level work that does not require

maintaining sustained concentration.").

Additionally, and contrary to Plaintiff's assertion, *Plaintiff's Memorandum of Law*, ECF

No. 10, p. 21, the vocational expert did not testify that the three particular jobs identified by her

were classified as light because the pace of the work. *See* R. 988.

Finally, in continuing to challenge the mental RFC determination, Plaintiff contends that

the ALJ failed to properly weigh Dr. Holzer's treating opinion. *Plaintiff's Memorandum of Law*,

ECF No. 10, pp. 21–23. This Court disagrees.

For claims filed before March 27, 2017,[7] "'[a] cardinal principle guiding disability

eligibility determinations is that the ALJ accord treating physicians' reports great weight,

---

[7] As previously noted, Plaintiff's original claim was filed on September 11, 2014. For claims filed after March 27, 2017, the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. §§ 404.1527, 416.927 *with* 20 C.F.R. §§ 404.1520c(a), 416.927c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including

especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (stating that an ALJ should give treating physicians' opinions "great weight") (citations omitted); *Fargnoli*, 247 F.3d at 43 (stating that a treating physician's opinions "are entitled to substantial and at times even controlling weight") (citations omitted). However, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record."). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (internal quotation marks and citations omitted). The ALJ must consider the following factors when deciding what weight to accord the opinion of a treating physician: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating source's specialization; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6).

---

controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources").

Accordingly, "the ALJ still may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (quoting *Morales*, 225 F.3d at 317); *see also Nazario*, 794 F. App'x at 209–10 ("We have also held that although the government 'may properly accept some parts of the medical evidence and reject other parts,' the government must 'provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.'") (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)); *Morales*, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit[.]"); *Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.") (internal citation omitted).

In the present case, the ALJ specifically considered Dr. Holzer's opinion at step four when crafting the RFC and assigned it "little weight[,]" explaining as follows:

> A treating psychiatrist at the VA, Dr. Cordula Holzer, M.D. completed a form entitled, "Medical Source Statement of Ability to do Work-Related Activities (Mental) (Exhibits 8F; 17F/5-7). In this form, Dr. Holzer indicated that the claimant had moderate or marked limitations as to the claimant's ability to understand, remember, and carry out instructions, and marked limitations as to the claimant's ability to interact appropriately with supervisors, coworkers, and the public as well as respond to changes in a routine work setting. Further, the claimant is not able to work with others. (Exhibits 8F; 17F/5-7). . . .

> While Drs. Holzer and Nola[8] are/were treating specialists, their opinions consists of conclusory statements on checkbox-type forms with poorly defined limitations and without an adequate written explanation containing citation to objective evidence in support of the same. Further, while the claimant generally having task-complexity level and social interaction limitations, as both opinions vaguely

---

[8] Vincent Nola, Psy.D., is another treating mental health specialist at the VA whose opinion Plaintiff does not challenge. *See* R. 941; *Plaintiff's Memorandum of Law*, ECF No. 10; *Plaintiff's Reply Brief*, ECF No. 14.

suggest, is generally consistent with the record, the extent of limitation suggested in these opinions is inconsistent with the record. In other words, the record fails to reveal that the claimant is as limited as these opinions suggest. For example, since the alleged onset date, the record documents inconsistent counseling/medication management sessions, inconsistent compliance with medication and medication recommendation, and no noted emergency room presentations due to mental health or psychiatric hospitalizations (Exhibits 1F-20F; B1F-B11F; B1F-B11F). Further, the VA treatment records failed to document the claimant making allegations of memory deficits, and they failed to reveal abnormal exam findings as to memory, understanding, or comprehension (Exhibits 1F; 5F; 6F; 7F; 11F-13F). Further, while the VA records document exam some findings of paranoia and auditory hallucinations coming from, or paranoid ideas, about TV (Exhibit 7F/77; 12F/25, 31, 39, 44, 53; 17F/2), these records fail to document exam findings of, or notations of, the claimant having difficulty getting along with his providers, and the source of auditory hallucination, as per the claimant, is from TV (id.). In other words, there is no indication that he has had auditory hallucinations in other circumstances. Therefore, in light of the above, the undersigned gives little weight to the opinions of Drs. Holzer and Nola.

R. 941–42. The Court finds no error in the ALJ's consideration in this regard. *See* 20 C.F.R. §§ 404.1527(c)(4), (6), 416.927(c)(4), (6); *Galette v. Comm'r Soc. Sec.*, 708 F. App'x 88, 91 (3d Cir. 2017) ("As we have explained, forms that 'require[ ] the physician only to check boxes and briefly to fill in blanks . . . are weak evidence at best.'") (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)); *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (concluding that the ALJ appropriately assigned limited weight to a treating physician's opinion where his "treatment notes, and in particular the treatment notes during the [relevant period], d[id] not support a finding that [plaintiff] was disabled at any time").

Plaintiff complains that the ALJ dismissed Dr. Holzer's opinion merely on the ground that it is "vague" and "poorly defined," and notes that the physician offered her opinion on the Agency's own form. *Plaintiff's Memorandum of Law*, ECF No. 10, p. 23. However, as the recitation above demonstrates, the ALJ did not discount Dr. Holzer's opinion merely because it was "vague." R. 941. Although the ALJ did criticize the format of the opinion, that observation was but one of many reasons given by the ALJ when discounting Dr. Holzer's opinion. R. 941–

25

42. Notably, the ALJ cited specific record evidence illustrating how this opinion was inconsistent with the record. *Id*.

To the extent that Plaintiff goes on to cite evidence that he believes supports Dr. Holzer's opinion, *Plaintiff's Memorandum of Law*, ECF No. 10, p. 23, the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also Chandler,* 667 F.3d at 359 ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard]."); *Hatton v. Comm'r of Soc. Sec. Admin*., 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . .  [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). This Court therefore declines Plaintiff's invitation to re-weigh the evidence or to impose his—or this Court's—own factual determination. *See Chandler*, 667 F.3d at 359; *Zirnsak,* 777 F.3d at 611 (stating that a reviewing court "must not substitute [its] own judgment for that of the fact finder").

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record, as does her consideration of Dr. Holzer's opinion.

**B.    Subjective Statements**

Plaintiff also challenges the ALJ's consideration of his subjective complaints. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 23–27. Plaintiff's argument is not well taken.

"Subjective allegations of pain or other symptoms cannot alone establish a disability." *Miller v. Comm'r of Soc. Sec*., 719 F. App'x 130, 134 (3d Cir. 2017) (citing 20 C.F.R. §

416.929(a)).  Instead, objective medical evidence must corroborate a claimant's subjective

complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20

C.F.R. § 404.1529(a)).  Specifically, an ALJ must follow a two-step process in evaluating a

claimant's subjective complaints. SSR 16-3p, 2016 WL 1119029 (March 16, 2016). First, the

ALJ "must consider whether there is an underlying medically determinable physical or mental

impairment(s) that could reasonably be expected to produce an individual's symptoms, such as

pain." *Id.* "Second, once an underlying physical or mental impairment(s) that could reasonably

be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the

intensity and persistence of those symptoms to determine the extent to which the symptoms limit

an individual's ability to perform work-related activities[.]" *Id.*; *see also Hartranft v. Apfel*, 181

F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or

symptom and the extent to which it affects the ability to work] obviously requires the ALJ to

determine the extent to which a claimant is accurately stating the degree of pain or the extent to

which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). In conducting this

evaluation, an ALJ must consider the objective medical evidence as well as other evidence

relevant to a claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(3) (listing the following

factors to consider: daily activities; the location, duration, frequency, and intensity of pain or

other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side

effects of any medication you take or have taken to alleviate pain or other symptoms; treatment,

other than medication, currently received or have received for relief of pain or other symptoms;

any measures currently used or have used to relieve pain or other symptoms; and other factors

concerning your functional limitations and restrictions due to pain or other symptoms); 20 C.F.R.

§ 404.1529(c)(3) (same). Finally, an "ALJ has wide discretion to weigh the claimant's subjective

complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. § 416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.,* 186 F. App'x 280, 286 (3d Cir. 2006) ("[A] reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").

Here, the ALJ followed this two-step evaluation process. The ALJ specifically considered Plaintiff's subjective complaints. R. 922, 929–30, 933–34, 937, 942. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 929–30. As previously discussed, the ALJ detailed years of medical evidence and record testimony to support her findings. R. 930–38. The ALJ went on to explain how Plaintiff's testimony, reports, and subjective statements were inconsistent with other record evidence:

> Turning to the claimant's actions and admissions, the same are also not entirely consistent with the extent of his alleged limitations. For example, the claimant reported having left shoulder and back issues with dressing, bathing while sitting down, dressing and bathing slower than he used to do the same, having someone care for his hair, that pain or mental health symptoms interfere with his ability to prepare meals, not doing chores, and, per Function Reports in 2014 and 2015, using a cane or crutches. He also reported not being able to finish what he starts, having a variable ability to pay attention based on his moods/feelings, not following spoken instructions well, and requiring reminders to take care of personal needs and take medicine. He further reported having problems getting along with others, not getting along with authority figures, "rarely" being in group settings, losing a prior job due to a problem dealing with his boss at a restaurant, being discharged from the National Guard due to problems with "higher authority figures," and not handling changes in routine well. (Exhibits 5E; 9E; 23E; 26E; B4E; B9E; Hearing Testimony).
>
> However, the claimant also reported that the highest level of school that he completed was college, earning certification in generator mechanics, HVAC and

the culinary arts, and never being in special education. He also reported being able to manage finances, being able to pay attention "for [the] required time as needed," being able to finish what he starts, being able to follow written and oral instructions, and not requiring reminders to go places, take care of personal needs, or take medicine. He further reported handling stress "as necessary" and never losing a job due to problems dealing with others. He additionally reported performing a wide variety of activities, including performing personal care activities independently, preparing simple meals, cleaning his room/space, reading (albeit every few months), watching television ("usually" world news and current events), using public transportation, shopping in stores and via phone, going to the library or visiting a neighbor or friend at times, and attending appointments at the VA. He also failed to report using a cane, crutches or a walker at the hearing and in his Function Reports dated from 2019 and 2020. (Exhibits 2E; 5E; 9E; 23E; 26E; B4E; B9E; Hearing Testimony).

Simply stated, the claimant's actions and admissions reveal that he is not as limited as he alleged from a physical or mental health standpoint.

Therefore, taking into consideration the claimant's subjective allegations and potential medication side effects, this evidence fully supports the assessed residual functional capacity. It does not support the assessment of different or additional limitations.

R. 937–38. Notably, the ALJ did not completely discount Plaintiff's subjective allegations, but took them into consideration when crafting the RFC. *Id*. In the view of this Court, this record provides substantial support for the ALJ's decision to discount Plaintiff's subjective statements as inconsistent with the record evidence. *See Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F. App'x at 286.

In challenging the ALJ's consideration in this regard, Plaintiff merely summarizes his hearing testimony and subjective reports with no accompanying argument or explanation. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 25–27. Plaintiff, who bears the burden of proof at steps three and four, simply has not established that the ALJ erred when considering his subjective statements. *See Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. . . . [T]he party seeking reversal normally must explain why the erroneous ruling

caused harm."); *Padgett v. Comm'r of Soc. Sec.*, No. CV 16-9441, 2018 WL 1399307, at *2

(D.N.J. Mar. 20, 2018) ("[B]ecause Plaintiff has articulated no analysis of the evidence, the

Court does not understand what argument Plaintiff has made here. Plaintiff has done no more

than throw down a few pieces of an unknown jigsaw puzzle and left it to the Court to put them

together. The Court does not assemble arguments for a party from fragments."). To the extent

that Plaintiff's recitation suggests that the ALJ should have credited the hearing testimony and

the subjective reports, his contention boils down to a disagreement with the ALJ whose decision

the Court has already explained is supported by substantial evidence. *See Perkins v. Barnhart*, 79

F. App'x 512, 514–15 (3d Cir. 2003) ("Perkins's argument here amounts to no more than a

disagreement with the ALJ's decision, which is soundly supported by substantial evidence.").

The Court will not reweigh this evidence. *Chandler*, 667 F.3d at 359; *Hatton*, 131 F. App'x at

880.

   For all these reasons, the Court concludes that the ALJ sufficiently explained her

reasoning in assessing Plaintiff's subjective complaints, and the ALJ's findings in this regard are

supported by substantial evidence in the record and are therefore entitled to this Court's

deference. *See* SSR 16-3p; *Miller*, 719 F. App'x at 134; *cf. Malloy v. Comm'r of Soc. Sec.*, 306

F. App'x. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony

regarding pain and other subjective complaints are for the ALJ to make.") (citing *Van Horn v.

Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)); *Davis v. Comm'r Soc. Sec.*, 105 F. App'x 319,

322 (3d Cir. 2004) (finding that the ALJ sufficiently evaluated the plaintiff's testimony where

"the ALJ devoted two pages to a discussion of claimant's subjective complaints and cited

Claimant's daily activities and objective medical reports"). Accordingly, the ALJ's assessment

of Plaintiff's subjective complaints will not serve as a basis for remand of this action. *Id*.

C.    **Step Five**

Plaintiff also raises a number of challenges to the ALJ's step five determination. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 27–35; *Plaintiff's Reply Brief*, ECF No. 14, pp. 1–5. For the reasons that follow, Plaintiff's arguments are not well taken.

At step five, an ALJ must decide whether the claimant, considering the claimant's RFC and vocational profile, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). Unlike in the first four steps of the sequential evaluation, it is the Commissioner who bears the burden of proof at step five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford*, 399 F.3d at 551). "'Advisory testimony from a vocational expert is often sought by the ALJ for that purpose [of determining whether other jobs exist in significant numbers in the national economy that the claimant could perform] . . . and factors to be considered include medical impairments, age, education, work experience and RFC.'" *Id.* at 205–06 (quoting *Rutherford*, 399 F.3d at 551). "Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). "Usually, the ALJ will ask whether a hypothetical claimant with the same physical and mental impairments as the claimant can perform certain jobs that exist in the national economy." *Zirnsak*, 777 F.3d at 614 (citing *Podedworny*, 745 F.2d at 218). "While 'the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations,' . . . '[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.'" *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (quoting *Rutherford*, 399 F.3d at 554). "[T]o accurately portray a claimant's impairments, the ALJ must

31

include all 'credibly established limitations' in the hypothetical. *Zirnsak*, 777 F.3d at 614 (citing *Rutherford*, 399 F.3d at 554). Credibly established limitations are limitations "that are medically supported and otherwise uncontroverted in the record." *Rutherford*, 399 F.3d at 554. "Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id.* (citations and internal quotation marks omitted). A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations. *Podedworny*, 745 F.2d at 218. Stated differently, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

In addition, "[a]s a general rule, occupational evidence provided by a [vocational expert] should be consistent with the occupational evidence presented in the DOT." *Zirnsak*, 777 F.3d at 617 (citing SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). Before relying on vocational expert testimony, an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] and information in the Dictionary of Occupational Titles[.]" SSR 00-4p, 2000 WL 1898704, at *1. "Specifically, an ALJ is required to (1) ask, on the record, whether the [vocational expert's] testimony is consistent with the DOT, (2) 'elicit a reasonable explanation' where an inconsistency does appear, and (3) explain in its decision 'how the conflict was resolved.'" *Zirnsak*, 777 F.3d at 617 (quoting *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)). While an "ALJ's failure to

comply with these requirements *may* warrant remand in a particular case[,]" "this Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id*. (citations omitted) (emphasis added); *see also Jackson v. Barnhart*, 120 F. App'x 904, 905–06 (3d Cir. 2005) ("[E]ven if it was error for the ALJ to fail to solicit testimony about potential conflicts between this portion of the VE's testimony and the DOT, the error was harmless. Where substantial evidence supports the ALJ's opinion and where the failure to solicit the testimony contemplated in SSR 00-4p is harmless, this court will not reverse the ALJ's decision.") (citations omitted).

In the case presently before the Court, the hypothetical question posed by the ALJ to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 929, 986–88. The vocational expert responded that the light, unskilled jobs of small product assembler, packer and sorter (routing clerk), and labeler could be performed by such an individual. R. 987–88. The vocational expert also denied that there were any conflicts between the occupational evidence that she provided and the DOT. R. 987; *see also Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002) (explaining that the DOT is a "publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy," and which ALJs generally consult to determine whether any jobs exist that a claimant can perform). On examination by Plaintiff's counsel, the vocational expert explained her job data methodology:

Q And what's the methodology that you use to compile your job data?

A Two different methodologies. I consider one using the U.S. Department of Labor Occupational Employment Statistics. The May 2020 report, which lists occupations by SOC. Then using the U.S. Department of Labor crosswalk DOT to SOC and then weighing within that based on the employment numbers according to the North

American Industrial Classification, the NAICS code within the employment by industry and occupation across, within that SOC to do an estimate by DOT. I also consider the Occupational Requirement, the U.S. Department of Labor's Occupational Requirement Survey, which looks at the percentage based on physical demand. So, using the SOC employment numbers and then using the, based on the physical demands within those SOCs, an estimate within that.

Q Okay. And you said that was current as of the 2020?

A That's correct, that's correct. So, yeah, the report, so the Occupational employment Statistics Report comes out in May pretty much every, you know, May of the year and it's based on the year before. So, the May 2020 report is based on 2019 numbers. The May 2021 report that will come out in two months will be based on – 2021 is the report, it will be based on 2020 numbers.

R. 991–92.

In her written decision, the ALJ relied on this expert evidence in finding that, prior to September 10, 2020, *i.e.,* the date on which Plaintiff's age category changed, Plaintiff could perform jobs that exist in significant number in the national economy. R. 943–44. In so finding, the ALJ also expressly addressed Plaintiff's challenges to the vocational expert's testimony, as raised in Plaintiff's post-hearing brief, R. 1296–1311, but overruled those objections. R. 943–44.

Plaintiff argues—and the Commissioner implicitly concedes—that two of the three jobs identified by the vocational expert (*i.e.*, small product assembler and labeler) require constant reaching, which is inconsistent with the RFC limitation to only frequent reaching. *Plaintiff's Memorandum of Law*, ECF No. 10, p. 30; *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 12, pp. 19–20; *Plaintiff's Reply Brief*, ECF No. 14, p. 1; *see also* R. 929 (limiting left side to, *inter alia*, only frequently reaching in all directions other than overhead), 987 (explaining that the DOT does not address overhead reaching); small product assembler, DICOT 739.687-030; labeler (marker), DICOT 920.687-126. Accordingly, the Court will consider Plaintiff's additional step five challenges only as they relate to the remaining job, packer and sorter (routing clerk), DICOT 222.687-022.

34

Plaintiff argues that the RFC's restriction to following simple instructions and simple work decisions is inconsistent with the DOT definition for routing clerk (packer and sorter), an occupation that requires reasoning level 2, *i.e.*, an ability to carry out "detailed" instructions.[9] *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 32–33; *Plaintiff's Reply Brief*, ECF No. 14, pp. 1–3. This Court disagrees. The United States Court of Appeals for the Third Circuit has held that a job with a reasoning level 2 does not "contradict the mandate that [the claimant's] work be simple, routine and repetitive." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004); *see also Jones v. Astrue*, 570 F. Supp. 2d 708, 716 (E.D. Pa. 2007) (finding no conflict between

---

[9] "The qualification categories listed by the DOT for each job include the job's Strength level, General Educational Development ("GED") level, and its Specific Vocational Preparation ("SVP") level." *Zirnsak*, 777 F.3d at 616 (quoting Appendix C, DOT). "GED measures 'those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.'" *Id*. "GED is broken into three categories: (1) reasoning development, (2) mathematical development, and (3) language development. . . . Reasoning levels in the DOT range from level 1 to level 6." *Id*. (citing Appendix C, DOT). GED reasoning level 1 applies "commonsense understanding to carry out simple one- or two-step instructions" in "standardized situations with occasional or no variables in or from these situations encountered on the job." Appendix C, 1991 WL 688702. Reasoning level 2 applies "commonsense understanding to carry out detailed but uninvolved written or oral instructions" in "problems involving a few concrete variables in or from standardized situations." *Id*. Reasoning level 3 applies "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" in "problems involving several concrete variables in or from standardized situations." *Id*. "SVP levels, on the other hand, measure the skill level necessary to perform a particular job." *Zirnsak*, 777 F.3d at 616 (citing SSR 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000)). "SVP levels in the DOT range from level 1 to level 9" and "[t]he DOT skill levels correspond with the second source of information relied on by the Commissioner: the CFR." *Id*. (citing SSR 00–4p). The CFR categorizes occupations into three classes: unskilled, semi-skilled, and skilled. 20 C.F.R. § 404.1568(a)–(c). "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time[,]" while "[s]emi-skilled work is work which needs some skills but does not require doing the more complex work duties," and "[s]killed work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced." *Id*. at § 404.1568(a), (b), (c). "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3.

simple and routine tasks and the definition of reasoning level 2) *aff'd*, 275 F. App'x 166, 168 (3d Cir. 2008)).

Plaintiff argues that, even absent an *inherent* conflict between the DOT and reasoning level 2 jobs, the particular facts of a case may create an *actual* conflict. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 32–33 (citing *Ellis v. Berryhill*, No. 17-5093, 2018 WL 6271578 (E.D. Pa. Nov. 30, 2018); *Alvarado v. Colvin*, 147 F. Supp.3d 297 (E.D. Pa. 2015)); *Plaintiff's Reply Brief*, ECF No. 14, pp. 1–3. This Court again disagrees. Significantly, the vocational expert in both *Ellis* and *Alvarado* expressly testified that the claimant's inability to carry out detailed instructions created an inconsistency with the identified reasoning level 2 jobs. *See Ellis*, 2018 WL 6271578 at *7–8; *Alvarado*, 147 F. Supp.3d at 306–07. The vocational witness in the instant case offered no such testimony. *See generally* R. 985–93. Accordingly, *Ellis* and *Alvarado* are inapposite.

Similarly unavailing is Plaintiff's assertion that the limitation to simple "instructions" in this case is "crucial" and identical to the basis for the conflict and resulting remand in both *Ellis* and *Alvarado*. *Plaintiff's Reply Brief*, ECF No. 14, pp. 1–2. Again, the Court disagrees. In *Hess*, the Third Circuit expressly stated that "[a] *limitation to 'simple tasks' is fundamentally the same as one* 'to jobs requiring understanding, remembering, and *carrying out only simple instructions and making only simple work-related decisions*[.]'" *Hess*, 931 F.3d at 210 (citations omitted) (emphasis added). *See also Dance v. Comm'r of Soc. Sec.*, No. 1:20-CV-03141-NLH, 2021 WL 3144696, at *9 (D.N.J. July 26, 2021) (stating that "[t]his Court has also addressed - and rejected - " the claimant's argument that "the ALJ erred by finding Plaintiff to be capable of performing two of the jobs . . . because the DOT lists these jobs as having a reasoning level of 2, which is a

higher level than the RFC's requirement that Plaintiff be limited to jobs with only simple instructions and tasks") (citations omitted).

Plaintiff next contends that there exists an unidentified conflict between the RFC limitation restricting Plaintiff to only occasional interaction with supervisors (and co-workers) and the vocational expert's testimony that "jobs exist in which a worker can only interact with a supervisors and co-workers for 1/3 of an 8 hour work day and only 1/3 of is in conflict of Social Security Rules and cannot be the basis of a Decision grounded in substantial evidence." *Plaintiff's Memorandum of Law*, ECF No. 10, p. 34 [sic]. Plaintiff appears to take the position that a limitation to occasional contact with supervisors would be work preclusive based on the vocational expert's testimony that 15% of the day "off task" and that an inappropriate interaction with a supervisor or coworker twice a month would be job preclusive. *Id*. (citing R. 990–92). Plaintiff complains that the ALJ did not explain "how a worker who can have no interaction for the vast majority of the day is somehow then able to sustain this demand of all employment." *Id*. Plaintiff's argument is not well taken.

At the hearing, the ALJ questioned the vocational expert about being off task, absences, and inappropriate interaction:

> Q All right, if an individual were going to be off task 15 percent of the day at any exertional level, would there be any jobs for them?
>
> A No. In my opinion that's not going to allow for sustaining any competitive work.
>
> Q If they were going to be absent two or more days per month?
>
> A That would be an -- two or more days a month, 24 days annually would be an excessive amount of absenteeism. Unlikely to be tolerated.
>
> Q They're going to have an inappropriate interaction with a supervisor or a coworker on at least two occasions a month?

A In my opinion, that's not going to be tolerated and would typically be subject to progressive discipline of verbal warnings then a written warning and then dismissal.

R. 990–91. Plaintiff's counsel further questioned the vocational expert about off task time:

Q And you said 15 percent time off task would be job preclusive. Is it fair to say that the inability to perform any of the basic mental demands of unskilled for that amount of time would be job preclusive?

A So, are you saying zero ability to, for attention, concentration, is that what you're saying?

Q Yeah, if you couldn't do, if you couldn't perform any of the basic demands of unskilled work for more than 15 percent of the time, would that also be job preclusive?

A Yeah. So, if a person, in my opinion, if they're off task 15 percent of the time or more for any reason, whether it is they're, you know, scrolling on their phone or they're just not able to concentrate or attend, it doesn't matter what the reason is, they're not going to be able to sustain competitive work.

R. 992. A fair reading of the vocational expert's testimony—and of the record in this action—does not support Plaintiff's assumption that Plaintiff would have "inappropriate interaction" with supervisors and co-workers simply because he would be limited to occasional contact with those persons. Neither the ALJ nor the vocational expert equated "occasional interaction" with "inappropriate interaction" and, although the ALJ posed hypotheticals to the vocational expert regarding time off task and inappropriate interactions with supervisors or co-workers, R. 990–91, the ALJ did not ultimately find that Plaintiff's RFC included those limitations or features. R. 929. Moreover, to the extent that Plaintiff suggests that the limitation to "occasional interaction" equates to an inability to interact at all with supervisors, Plaintiff does not point to any supporting evidence. Cf. *Melissa B. v. Comm'r of Soc. Sec.*, No. CV 20-9029, 2021 WL 5578698, at *5 (D.N.J. Nov. 30, 2021) ("Rather, the ALJ found that Plaintiff needed to be limited to occasional contact with her supervisors and co-workers; nowhere did the ALJ conclude that Plaintiff would be unable to engage in contact at all with her supervisor, so long as

the contact was only occasional."); *Hester v. Comm'r of Soc. Sec. Admin.*, No. CV 21-19073 (ZNQ), 2022 WL 17991147, at *9 (D.N.J. Dec. 29, 2022) ("The ALJ did not find that Plaintiff would be unable to interact with co-workers or supervisors at all but, rather, found Plaintiff was able to interact with them occasionally. Plaintiff fails to cite any evidence in the record that could establish that he is fully unable to interact with supervisors and co-workers."). Based on this record, the Court cannot conclude that there was a conflict reflected in the vocational expert testimony that requires remand. *Cf. Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987) ("A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."); *O'Neill v. Comm'r of Soc. Sec.*, No. CV 18-0698, 2019 WL 413539, at *9 (D.N.J. Jan. 31, 2019) ("[T]he ALJ does not have a duty to respond to Plaintiff's counsel's attempts to expand the hypothetical question. Again, SSR-004P only focuses on apparent conflicts with the VE's testimony and the DOT listing, not attempted conflicts with the initial ALJ hypothetical and a newly revised one from Plaintiff's counsel").

In continuing to challenge the ALJ's step five determination, Plaintiff contends that "the ALJ failed to properly consider conflicting job data in Record, which shows that the VE's testimony was not reliable." *Plaintiff's Memorandum of Law*, ECF No. 10, p. 30. Plaintiff points to his post-hearing brief as containing "job data which directly conflicts with what the VE provided. (R. 1296 – 1311)." *Id*. Plaintiff insists that the ALJ was obliged to "to properly consider" this submission, including conflicting job data. *Id*. at 31. According to Plaintiff, the failure to consider such data "goes to the fairness of the hearing" and he argues that the ALJ's "failure to conduct a full and fair hearing is an abuse of discretion." *Id*. Plaintiff's argument is not well taken.

As previously noted, the ALJ specifically addressed Plaintiff's argument, which Plaintiff raised in post-hearing briefing, as follows:

> The claimant's representative objected to these jobs and job numbers on the grounds that the above-stated jobs would not be available under the assessed residual functional capacity and that the job numbers provided by the vocational expert were not correct/reliable (Exhibit 47E [R. 1296–1311]). The undersigned overrules these objections. Firstly, the vocational expert has professional knowledge and experience in job placement, as detailed at length in the vocational expert's resume (Exhibit 44E), and has been determined by the Commissioner to be sufficiently qualified to provide vocational evidence in this matter. Secondly, the vocational expert's job numbers are reliable because they were based on publications of which the SSA takes administrative notice (20 CFR 404.1560(b)(2), 404.1566(d), 404.1566(d), and 416.966(d)). Specifically, the vocational expert testified that her source of job numbers is based on two methodologies. The expert's first methodology is using the U.S. Department of Labor's Occupational and Employment Statistics May 2020 Report, which lists occupations by SCO (Selected Characteristic of Occupations), then using the U.S. Department of Labor cross walk DOT to SCO and, then weighing within that, based on the employment numbers according to the North American Industrial Classification, she arrives at an estimate of numbers of available jobs with an industry. The expert's second methodology is using the U.S. Department of Labor's Occupational Requirement Survey that looks at percentages based on physical demand, then using SCO employment numbers, and then making an estimate as of number of available jobs. The expert also testified that the U.S. Department of Labor's Occupational and Employment Statistics Report comes out every May based on the prior year's numbers. Simply stated, the vocational expert is qualified and the vocational expert's job information is reliable. Therefore, the claimant's objections are overruled.
>
> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the DOT. The undersigned has further determined that the vocational expert was well qualified to testify as to overhead reaching versus reaching in other directions, reaching and pushing/pulling limitations with only one extremity versus both upper extremities, dominant versus non-dominant extremity/side, work decisions, and social interaction based on this expert's professional experience, education, and training (Exhibit 44E).
>
> Based on the testimony of the vocational expert, the undersigned concludes that, prior to the established onset date of disability, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. Prior to September 10, 2020, a finding of "not disabled" is therefore appropriate under the framework of the above-cited rules in the Medical-Vocational Guidelines.

R. 943–44. The Court cannot conclude that the ALJ erred in relying on vocational expert

testimony that in turn relied on job evidence from the United States Department of Labor. *See* 20

C.F.R. §§ 404.1566(d), 416.966(d); *cf. Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183,

189 (3d Cir. 2007) (noting that the vocational expert's "testimony makes clear that he relied on

Department of Labor surveys in reaching his opinion as to how many jobs were available during

the relevant time period which [the claimant] could perform given her limitations" and that, even

if the expert did not review those reports before testifying, "we do not believe that this failure

renders his testimony unreliable, in view of his approximately thirty years of experience as a

vocational expert, and in light of his testimony that he was certain that these reports would

support his testimony"); *Melissa B. v. Comm'r of Soc. Sec*., No. CV 20-9029, 2021 WL

5578698, at *6 (D.N.J. Nov. 30, 2021) (rejecting claimant's argument that the vocational

expert's reliance on SOC codes, which he alleged "inflate the actual number of jobs in the

national economy," was erroneous and finding that "[n]umerous courts have permitted the use of

SOC codes by VEs" and finding "no convincing reason to rule otherwise here") (collecting

cases) (citations omitted); *Holley v. Colvin*, 975 F. Supp. 2d 467, 485 (D.N.J. 2013) (finding that

the ALJ "properly relied upon the VE's sufficiently substantiated testimony" at step five where

the vocational expert "based his testimony on statistics provided by the Department of Labor in

addition to his own experience" and that the VE's "expertise was necessary to cross-reference

that Department of Labor statistics against the DOT titles in order to extrapolate a more specific

figure regarding jobs in the area that would be available to Plaintiff"), *aff'd sub nom. Holley v.*

*Comm'r of Soc. Sec*., 590 F. App'x 167 (3d Cir. 2014). The ALJ's detailed consideration of

Plaintiff's objections therefore belies his assertion that the ALJ failed to properly consider his

post-hearing arguments.

Moreover, although Plaintiff insists that the job data that he provided to the ALJ conflicts with the vocational expert's testimony, he does not explain that data or how he compiled that data. *Plaintiff's Memorandum of Law*, ECF No. 10, pp. 30–31 (citing, *inter alia*, R. 1296–1311); *Plaintiff's Reply Brief*, ECF No. 14, pp. 3–5. Plaintiff simply asserts that "[a]t Light, the Packing/Sorting numbers are off by 50%." R. 1297; *see also* R. 1299–1300 (containing printout from SkillTRAN regarding routing clerk job). Plaintiff also pronounces the vocational expert's testimony regarding job data to be inaccurate and in conflict with evidence from the United States Department of Labor Bureau of Labor Statistics but, again, he offers no further explanation. R. 1297 ("The testimony that was provided to Your Honor is not accurate and accordingly cannot be relied on by the Commissioner at Step 5 as it is not based on substantial evidence. The VE testimony is in conflict with the information pursuant to the US Dept of Labor Bureau of Labor Statistics."); *cf. Atkins*, 2020 WL 1970531, at *4; *Padgett*, 2018 WL 1399307, at *2.

In any event, even if the Court accepted—for present purposes only without definitively deciding—Plaintiff's assertion that the job numbers for the job of packer and sorter (routing clerk) are "off by 50%[,]" R. 1297; *Plaintiff's Memorandum of Law*, ECF No. 10, p. 31 (same); *Plaintiff's Reply Brief*, ECF No. 14, p. 3 (same), there still exist a significant number of those jobs (totaling 80,000 packer and sorter (routing clerk) jobs) that Plaintiff could perform. R. 943 (reflecting ALJ's finding that there existed 160,000 packer and sorter jobs), 987 (reflecting the vocational expert's testimony that there existed 160,000 packer and sorter jobs). Accordingly, even Plaintiff's own statement of the number of packer and sorter (routing clerk) jobs reflects a significant number of jobs (80,000) that he could perform prior to his established date of disability. *Id.*; *see also Pierznik v. Comm'r Soc. Sec.*, No. 22-2369, 2023 WL 4014468, at *2 (3d

42

Cir. June 15, 2023) ("[T]he ALJ need only establish that a claimant is capable of performing one

job that exists in significant numbers in the national economy."), *cert. denied sub nom. Pierznik*

*v. O'Malley*, 144 S. Ct. 1035, 218 L. Ed. 2d 190 (2024); *Lamoureux v. Comm'r of Soc. Sec.*

*Admin.*, No. 21-1677, 2021 WL 5860738, at *2 (3d Cir. Dec. 10, 2021) (finding that the "ALJ

elicited adequate testimony by the vocational expert to find that jobs existed in the national

economy that were appropriate for" the claimant where the vocational expert "identified nearly

36,000 jobs in the national economy that would be available for someone with the claimant's

functional capacity" and finding that "the logical conclusion, then, is that the ALJ, hearing the

vocational expert's testimony about the number of jobs available in the national economy, found

that those jobs constituted work existing in significant numbers in the national economy");

*Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) (stating that "there is no precise estimate

for what constitutes 'significant numbers' of jobs under the Social Security Act" and finding that

"testimony from the vocational expert that 20,000 jobs were available in the national economy is

sufficient to support a finding that work exists in significant numbers") (citations omitted);

*Penrose v. Comm'r of Soc. Sec.*, No. 1:20-CV-00011-NLH, 2020 WL 7640585, at *7 (D.N.J.

Dec. 23, 2020) ("At the end of the five-step analysis, an ALJ need only establish that a claimant

is capable of performing one job that exists in significant numbers in the national economy."). At

bottom, remand on the basis of purportedly flawed job data from the vocational expert is not

warranted.

　　　　Finally, Plaintiff argues that the routing clerk (packing and sorter) job falls outside the

RFC because the job requires a rapid pace, which is not included in the RFC. *Plaintiff's*

*Memorandum of Law*, ECF No. 10, p. 30; *Plaintiff's Reply Brief*, ECF No. 14, pp. 5–6. However,

as the Court has already explained, the vocational expert did not testify that the job of routing clerk (packing and sorter)—or either of the other two jobs—required a rapid pace. R. 988.

In short, the Court finds that the Commissioner has carried his burden at step five of the sequential evaluation and concludes that substantial evidence supports the ALJ's determination in this regard.

## VI.    CONCLUSION

For all these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  November 18, 2024                           *s/Norah McCann King*
                                                    NORAH McCANN KING
                                                    UNITED STATES MAGISTRATE JUDGE